# Exhibit A

# Greer Laboratories' Motion for Summary Judgment

*United States ex rel. Skibo v. Greer Laboratories, Inc., et al.*

July 25, 2019

**CHOATE HALL & STEWART LLP**

# Relators' Complaint Specifically Alleges That Greer's Competitors Sold Unlicensed Custom Mixes Without Named-Patient Prescriptions

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

FILED
CHARLOTTE, NC
MAY 09 2014
US District Court
Western District of NC

United States *ex rel.*, LIUBOV SKIBO and EDWARD PATT, BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, and THE DISTRICT OF COLUMBIA,

Plaintiffs,

v.

GREER LABORATORIES, INC., a North Carolina Corporation, ARES LIFE SCIENCES, an Investment Partnership based in the Bailiwick of Jersey, Channel Islands, ALLERMED LABORATORIES, INC., a California Corporation, ANTIGEN LABORATORIES, INC., a Missouri Corporation, ALK-ABELLO, INC., a Delaware Corporation, and ALLERGY LABORATORIES, INC., an Oklahoma

Case No.: 5:13-cv-110 (RV)

**AMENDED COMPLAINT and JURY DEMAND**

***COMPLAINT FILED IN CAMERA AND UNDER SEAL, PURSUANT TO 31 U.S.C. §3730(b)(2)***

*****DO NOT PLACE IN PRESS BOX*****
*****DO NOT ENTER ON PACER*****

Case 5:13-cv-00110-RLV-DSC Document 10 Filed 05/09/14 Page 1 of 52

combinations of antigens made upon request. Allermed manufactured and sold these custom mixtures without requiring that the mixtures be linked to a specific patient as a patient prescription. These mixtures were not covered by Allermed's BLA and were not approved by the FDA. Through Greer, Allermed continues to accept orders for, and continues to

94. Prior to its acquisition by Ares Life Sciences, Antigen Labs formulated and sold "custom mixes" that could be made upon request. Antigen Labs' 2012 catalog stated as follows:

Custom Mixes

If we do not carry a stock mix with the components you need, you may request to have a custom mixture made.

**Key points of the Custom Mix policy:**

- Minimum of 100ml of each mixture (two 50ml vials, or four 30ml vials).
- A maximum of twelve ingredients may be specified for each mixture.
- All orders must be prepaid and cannot be returned.
- Requires a physician's signed order.

Antigen Labs' June 2013 catalogue has the same language. Antigen Labs manufactured and sold these custom mixtures without requiring that the mixtures be linked to a specific patient as a patient prescription. These mixtures were not covered by Antigen Labs' BLA and were not approved by the FDA. Through Greer, Antigen Labs continues to accept orders for, and

states that there is an "additional charge for custom mixes." Allergy Labs manufactured and sold these custom mixes without requiring that the mixes be linked to a specific patient as a patient prescription. These mixtures were not covered by Allergy Labs' BLA and were not approved by the FDA, and, therefore, these unapproved custom mixtures of allergenic

ALK-Abello manufactured and sold these custom mixes without requiring that the mixes be linked to a specific patient as a patient prescription. These mixtures were not covered by ALK-Abello's BLA and were not approved by the FDA, and, therefore, these unapproved

Am. Compl. at ¶¶ 93-96



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Custom Mixes Were an Industry-Wide Practice for Decades

KAISER PERMANENTE®

May 15, 2015

Leslie Kux, Associate Commissioner for Policy
Division of Drug Information
Center for Drug Evaluation and Research
Food and Drug Administration
10903 New Hampshire Avenue, Building 51, Room 2201
Silver Spring, MD 20993

Re: Docket No. FDA-2014-D-1525; Draft Guidance entitled "Mixing, Diluting, or Repackaging Biological Products Outside the Scope of an Approved Biologics License Application"

Dear Ms. Kux,

As Regi... appreci... Diluting... Applica... under ... Biologi... docum... the car... mixture... prohibi... mixture... prohibi...

> Mixtures of allergen extracts prepared for diagnosis and treatment of multiple patients, called custom bulk extracts, have been used safely and effectively for approximately 100 years. In fact, there has never been a reported case in the medical literature of an infection due to allergen immunotherapy.[1] The absence of reported infectious complications from allergen immunotherapy reflects the fact that allergen extracts typically contain glycerin and/or antibacterial agents such as phenol, and are thus inherently sterile. Published guidelines for allergen immunotherapy contain recommendations for the safe and effective use of custom bulk extracts in the administration of allergen immunotherapy.[2]

Mixtures of allergen extracts prepared for diagnosis and treatment of multiple patients, called custom bulk extracts, have been used safely and effectively for approximately 100 years. In fact, there has never been a reported case in the medical literatur... The absence of reported infectious complications fr... allergen extracts typically contain glycerin and/or a... inherently sterile. Published guidelines for allergen... safe and effective use of custom bulk extracts in the...

> There is clear utility to the use of custom bulk extracts in the management of allergic conditions. For example, it is not uncommon for multiple patients to possess identical allergen sensitivities, as in insect venom allergy or as in cat and dog allergy. The availability of custom venom extract mixtures and of cat-

There is clear utility to the use of custom bulk extra... example, it is not uncommon for multiple patients to possess identical allergen sensitivities, as in insect venom allergy or as in cat and dog allergy. The availability of custom venom extract mixtures and of cat-

regulations.gov

## Comment from William Crawford, MD

The is a Comment on the **Food and Drug Administration** (FDA) Notice: Mixing, Diluting, or Repackaging Biological Products Outside the Scope of an Approved Biologics License Application; Draft Guidance for Industry; Availability

For related information, Open Docket Folder

Comment Period Closed
May 20 2015, at 11:59 PM ET

**ID:** FDA-2014-D-1525-0190
**Tracking Number:** 1jz-8iwl-e4bm

Comment

See attached file(s)

Attachments (1)

Response to FDA Draft Guidance on Mixing of ...oducts Comment from William ...

+ View more information

Document Information

**Date Posted:**
May 22, 2015

Show More Details

Submitter Information

**Country:**
United States

**State or Province:**
CA

**Category:**
Health Professional - A0007

Dr. William Crawford, Comment on 2015 Guidance (May 15, 2015)



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Custom Mixes Were an Industry-Wide Practice for Decades

ADVOCACY COUNCIL
of the American College of Allergy, Asthma & Immunology

CHAIRMAN
J. Allen Meadows, MD (16)
Montgomery, AL
VICE-CHAIR
Stephen A. Imbeau, MD (16)
Florence, SC
TREASURER
Bradley E. Chipps, MD
Sacramento, CA
BOARD OF DIRECTORS
Kathleen R. May, MD (15)
Cumberland, MD
Bryan L. Martin, DO (16)
Powell, OH
Maeve E. O'Connor, MD (16)
Charlotte, NC
Purvi S. Parikh, MD (16)
New York, NY
John R. Seyerle, MD (16)
Cincinnati, OH
Marissa R. Shams, MD (15)
Atlanta, GA
Brian A. Smart, MD (15)
Long Grove, IL 60047
James L. Sublett, MD (15)
Louisville, KY
James M. Tracy, DO (16)
Papillion, NE

August 11, 2015

2015 AUG 12 P 12:25

Not mentioned in our previous comment, but equally important, is the practice of many allergists of using special mixes of licensed allergenic extracts prepared by allergy extract manufacturers based on an allergist's special order. An example of this is a special grass mix that would include grass extracts specific to a geographic area. For example, allergists treating patients in certain parts of the southwest might use a special grass mix of Bermuda, Bahia and Johnson grasses. Although the allergist could buy the extracts individually and mix them in the office for an individual patient, it is more efficient and reduces the chances of error, as well as the cost and work of preparation, if the materials are pre-mixed by the manufacturer.

safely performed for many years. We asked that the draft guidance be modified to allow for preparation of testing vials even though the vials are not prepared for a specific individual patient.

Not mentioned in our previous comment, but equally important, is the practice of many allergists of using special mixes of licensed allergenic extracts prepared by allergy extract manufacturers based on an allergist's special order. An example of this is a special grass mix that would include grass extracts specific to a geographic area. For example, allergists treating patients in certain parts of the southwest might use a special grass

"prescription sets." We note that there is little or no difference between, on the one hand, creating a mixture of antigens which will then be used by the allergist to prepare vials for individual patients, and, on the other hand, mixing a patient vial using individual antigens. In the end, the antigens all end up mixed together for use by an individual patient. The only difference is that some of the mixing is done in advance and the mixture then used for multiple patients. We believe the draft guidance should permit this longstanding practice to continue and ask that the final guidance accommodate this practice.

85 W. Algonquin Road, Suite 550 Arlington Heights, IL 60005 847.427.1200 acaai.org

regulations.gov

C Comment from Advocacy Council of ACAAI

The is a Comment on the **Food and Drug Administration** (FDA) Other: **Guidance for Industry Mixing, Diluting, or Repackaging Biological Products Outside the Scope of an Approved Biologics License** ... **raft Guidance**

...rmation, **Open Docket Folder**

...ents (1)

...mment from Advocacy Council of ACAAI

...v **Attachment:** PDF + View more information

...**uthors:**
...ler; cber

Comment Period Closed

**ID:** FDA-2014-D-1525-0349
**Tracking Number:** 1jz-8kik-1be6

Document Information

**Date Posted:**
Aug 12, 2015
**Show More Details**

Submitter Information

**Category:**
Association - D0003

We are concerned that under the draft guidance, extract manufacturers will no longer be able to prepare these special mixes because they would not be prepared for an individual patient and thus would not be considered

American College of Allergy, Asthma & Immunology, Comment on 2015 Guidance (August 11, 2015)

# APMA Letters Confirm Custom Mixes Were an Industry-Wide Practice

apma

ALLERGEN PRODUCTS MANUFACTURERS' ASSOCIATION

April 21, 2014

Mary Anne Malarkey, Director
Office of Compliance and Biologics Quality
HFM-600, CBER, FDA
1401 Rockville Pike
Rockville, MD 20852-1448

Dear Ms. Malarkey:

The Allergen Products Manufacturers' Association (APMA), is an organization that represents the scientific and compliance interests of manufacturers of allergenic products. It has become apparent to the representative companies of the APMA that a focus during recent FDA inspections is the historical practice of manufacturing "Custom Mixes" (sometimes referred to as "Doctor Mixes") and whether or not this activity is within the scope of the manufacturer's licenses. Custom Mixes are mixes of individual allergenic extracts, manufactured (formulated) in response to a physician's order for office use. The purpose of this letter is to request a meeting for members of FDA and APMA to discuss Custom Mixes to permit the appropriate exchange regarding the history of the manufacturing of Custom Mixes, including the quality processes employed, and the appropriate regulatory framework and oversight to continue this important operation, which serves the specific needs of allergy practitioners and their patients.

As stated above, Custom Mixes are customized mixes of stock concentrates of allergenic extracts (see 21 CFR 680.3(b)(1)) based on specific orders of physicians. These are mixes that are intended for office use in the preparation of individual treatment sets by the physicians. Custom Mixes have historically been manufactured for physicians in individual or multiple vial lots, and some cases as sets of dilution series. This practice of manufacturing Custom Mixes by each APMA member company has been documented in various correspondences with FDA, and includes recognition and acknowledgement of this practice, without objection, during facility inspections over the years,.

In addition to the company-specific correspondence and FDA acknowledgement mentioned above, the APMA believes citations within the CFR permit the manufacture of Custom Mixes. Section 680.3(b)(1) of 21 CFR states, "A stock concentrate is an extract derived from a single allergenic source and used in the manufacture of more than one lot of product, and from which final dilutions or mixtures, are prepared directly." This statement acknowledges the use of individual antigens to manufacture final dilutions and mixtures. Additionally, in 21 CFR 600.13, "Manufacturers shall retain for a period of at least 6 months after the expiration date, unless a different time period is specifie… representative material of each lot of each product, sufficient for… potency, except Whole Blood, Cryoprecipitated AHF, Platelets, … Plasma and Allergenic Products prepared to a physician's prescript… the manufacturer from the requirement of retaining retentio… acknowledges the acceptability of the preparation of such mixes by a manufacturer.

We refer you also to the *Guidance for Industry: On the Content and Format of Chemistry, Manufacturing and Controls Information and Establishment Description Information for an Allergenic Extract or*

Exhibit R

Case 5:13-cv-00110-KDB-DSC Document 188-1 Filed 11/07/19 Page 6 of 26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# APMA Letters Confirm Custom Mixes Were an Industry-Wide Practice

ALLERGEN PRODUCTS MANUFACTURERS' ASSOCIATION

July 18, 2014

Via Email: <contact@hhs.gov> <and Overnight Mail>

Jay E. Slater, M.D.
Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Vaccines Research and Review
Division of Bacterial, Parasitic & Allergenic Products, HFM-425
1401 Rockville Pike
Rockville, MD 20852-1448

Re: Allergen Extract Custom Mixes and the Compounding Quality Act

Dear Dr. Slater:

The Allergenic Products Manufacturers' Association (APMA) represent
and regulatory compliance interests of manufacturers of allergenic products
nation and is committed to enhancing the contributions of allergenic product m
the public welfare through cooperation with government agencies in the developm
standards.[1] Historically, the APMA has worked with its members to represent their interests to FDA on scientific and regulatory matters and supply a venue for that to occur. We provide an annual forum for industry and FDA to meet for an Information Exchange, provide test results to the Laboratory of Immunobiochemistry for FDA-issued controls and sera, and work to solve
inconsistencies in the data
standards that apply to the
allergen extract industry. T
produce safe, effective, and
public welfare.

One subject that ha
industry is Custom Mixes.
to manage activities related
scope of their approved lice
after many years of consiste
existing licenses, recent FD
APMA members regarding
APMA recognizes that ma
and potency testing requirem

[1] For additional information regarding the APMA, please visit: http://www.apma.us/.
[2] Potency testing only applies to standardized products.

One subject that has recently been a topic of discussion within the allergen extract industry is Custom Mixes. Manufacturers of allergenic products have historically and continue to manage activities related to the manufacture of custom mixes of allergenic products within the scope of their approved license agreements and in accordance with FDA regulations. However, after many years of consistent FDA recognition of the acceptable status of custom mixes under existing licenses, recent FDA enforcement activity has led to uncertainty amongst industry and APMA members regarding appropriate compliance measures applicable to custom mixes. The

allergies, allergic rhinitis, allergic sinusitis, and allergic conjunctivitis.[4,5] Allergen extract products are distributed directly to licensed healthcare providers who request custom mixes of the allergen extracts from manufacturers for treatment of their patients. The custom mixes are prepared by FDA registered manufacturers using FDA approved biological products or stock concentrates of approved biological products and have been available on the market since 1921.

**IV. Current Conflict within FDA Regulations and Guidance**

Although the FDA has been aware of the manufacture of custom mixes for decades, only recently did the FDA indicate that the practice may be improper. Specifically, the FDA indicated that the manufacture of custom mixes for office use without an approved BLA for each custom mix and absent a link to a specific patient or prescription is impermissible under FDA regulations.[13] This position directly conflicts with the FDA's prior long-standing position with regard to custom mixing generally, and also suggests a potential need to clarify FDA regulations and guidance as to whether custom mixing is permissible without an approved BLA for each custom mix.

Exhibit 9

# APMA Letters Confirm Custom Mixes Were an Industry-Wide Practice

apma

ALLERGEN PRODUCTS MANUFACTURERS' ASSOCIATION

12 March 2015

Mary Anne Malarkey, Director
Office of Compliance and Biologics Quality
HFM-600, CBER, FDA
1401 Rockville Pike
Rockville, MD 20852-1448

Dear Ms. Malarkey,

The Allergen Products Manufacturers' Association (APM… guidance issued by FDA regarding the mixing of biolo… biologics license application (*Mixing, Diluting, or Repack… Scope of an Approved Biologics License Application, G…* U.S. DHHS, FDA, CDER, CBER. February 2015).

Based on APMA's reading of the draft, as well as the agency's interpretation of the applicability of section 503B of the FD&C Act to biologics approved under the PHS Act, the APMA member extract manufacturing companies have made the decision to discontinue the manufacture of what the industry terms Custom Mixes or Special Mixes that have been prepared to a physician's order not associated with a named patient. Based on the needs of the physicians to ensure continuity of treatment for their patients, the companies may choose to phase out the … and distribution of the mixes through the comment period to the draft guidance… discretion of the member companies until finalization of the guidance.

As provided for under section III.B. of the draft guidance, member companies ma… discretion, continue to prepare prescription sets of allergenic extracts "for sul… immunotherapy diluted with appropriate diluents prepared according to instructio… prescription or order by a licensed physician for an individual patient."

If you have comments to this APMA notification, or would like to discuss further th… company's proposals for the discontinuation of preparing and distributing Custom Mi… do not hesitate to contact anyone of the undersigned APMA officers to arrange the … venue.

Sincerely,

Mark Hites, APMA President
GREER Laboratories, Inc.

Eric Bell, APMA Vice President
Allergy Laboratories, Inc.

Steven Haynes, APMA Treasurer
ALK-Abello, Inc.

Karen Arnold, APMA Se…
Jubilant HollisterStier, LL…

Greg Plunkett, PhD, Scientific Director
ALK-Abello, Inc.

Based on APMA's reading of the draft, as well as the agency's interpretation of the applicability of section 503B of the FD&C Act to biologics approved under the PHS Act, the APMA member extract manufacturing companies have made the decision to discontinue the manufacture of what the industry terms Custom Mixes or Special Mixes that have been prepared to a physician's order not associated with a named patient. Based on the needs of the physicians to ensure

Steven Haynes, APMA Treasurer
ALK-Abello, Inc.

Greg Plunkett, PhD, Scientific Director
ALK-Abello, Inc.

Karen Arnold, APMA Secretary
Jubilant HollisterStier, LLC

Eric Bell, APMA Vice President
Allergy Laboratories, Inc.

GRLI-00131715

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# FDA Cited Two Competitor Companies for Custom Mixes in 2014

DEPARTMENT OF HEALTH AND HUMAN SERVICES

MAY 2 3 2014

Food and Drug Administration
Silver Spring MD 20993

UPS EXPRESS MAIL & FACSIMILE

Rebecca Johnson
President
Allergy Laboratories, Inc.
1005 SW 2nd Street
Oklahoma City, OK 73109

> your Internet website www.allergylabs.com. Your website promotes mixtures of allergenic extracts for indications including skin diagnosis and treatment (immunotherapy) of patients with seasonal and perennial allergies. Your website refers to these as "custom mixes." These

Dear Ms. Johnson:

The Office of Compliance and Biologics Quality in the Center for Biologics Evaluation and Research of the United States Food and Drug Administration (FDA) has reviewed your Internet website w
extracts for indications
seasonal and perennial
mixtures are described
to your specifications u
pages are enclosed for
The mixtures of allergenic extracts referenced above are drugs as defined under section 201(g) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) [21 U.S.C. 321(g)] and biological products as defined in section 351(i) of the Public Health Service Act (PHS Act) [42 U.S.C. 262(i)].

> You currently hold approved biologics license applications (BLAs) for numerous allergenic extracts; however, these BLAs do not include provisions for manufacturing these "custom mixes."

You currently hold approved biologics license applications (BLAs) for numerous allergenic extracts; however, these BLAs do not include provisions for manufacturing these "custom mixes."

Please be reminded that licensed biologic
biological products, either therapeutic, pr
for the combined product [21 CFR 610.17
your Internet website are not the subject o
is there an investigational new drug applic
mixtures of allergenic extracts for which a
the FD&C Act and the PHS Act and may result in FDA seeking relief as provided by law.

> Please be reminded that licensed biological products may not be combined with other licensed biological products, either therapeutic, prophylactic or diagnostic, except as a license is obtained for the combined product [21 CFR 610.17]. The mixtures of allergenic extracts described on your Internet website are not the subject of an approved biologics license application (BLA) nor

GRLI-00078537



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# FDA Cited Two Competitor Companies for Custom Mixes in 2014

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT OFFICE ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
| --- | --- |
| Division of Medical Products and Tobacco Program Operations<br>Office of Medical Products and Tobacco Operations, U.S. Food & Drug Administration<br>12420 Parklawn Drive, ELEM-2032 | 2/11/2014 -25/2014 |
| | FEI NUMBER |

| FIRM NAME | STREET ADDRESS |
| --- | --- |
| ALK-Abello, Inc. | 35 Channel Drive |
| CITY, STATE AND ZIP CODE | TYPE OF ESTABLISHMENT INSPECTED |
| Port Washington, NY 11050 | Allergenic Extract Manufacturer |

THIS DOCUMENT LISTS OBSERVATIONS MADE BY THE FDA REPRESENTATIVE(S) DURING THE INSPECTION OF YOUR FACILITY. THEY ARE INSPECTIONAL OBSERVATIONS; AND DO NOT REPRESENT A FINAL AGENCY DETERMINATION REGARDING YOUR COMPLIANCE. IF YOU HAVE AN OBJECTION REGARDING AN OBSERVATION, OR HAVE IMPLEMENTED, OR PLAN TO IMPLEMENT CORRECTIVE ACTION IN RESPONSE TO AN OBSERVATION, YOU MAY DISCUSS THE OBJECTION OR ACTION WITH THE FDA REPRESENTATIVE(S) DURING THE INSPECTION OR SUBMIT THIS INFORMATION TO FDA AT THE ADDRESS ABOVE. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT FDA AT THE PHONE NUMBER AND ADDRESS ABOVE.

DURING AN INSPECTION OF YOUR FIRM (I) (WE) OBSERVED:

1. Product is not manufactured as described in the approved licensed. For example:

A. Customers place orders for special mix lots, which are composed of a (b) (4) [redacted] (b) (4) [redacted] aqueous allergenic finished licensed products. The customer orders are not

...ed per week.

...f product is not retained and
...te container –closure system.

...ance with all approved release
... with sterility and visual

...products has not been
...P 117.05 (16143version 03)
...ing Area(APA), has not been
...different extracts are not
bacteriostatic and/or fungistatic.

2. Procedures designed to prevent microbiological contamination of sterile products are deficient. Specifically,

A. Frequency of environmental monitoring performed on the Laminar Air Flow (LAF) Units in the Small Volume Production area (Room (b)(4)) where licensed (Made to Stock) and special mix products are aseptically manufactured is deficient. The (b)(4) LAF units in the aseptic filling area (Room (b)(4)) are only monitored (b) (4)

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or Type) | DATE ISSUED |
| --- | --- | --- | --- |
| | [signature] | Susan M. Jackson, CSO | 2/25/2014 |

FORM FDA 483 (9/08) PREVIOUS EDITION OBSOLETE INSPECTIONAL OBSERVATIONS Page 1 of 3

DURING AN INSPECTION OF YOUR FIRM (I) (WE) OBSERVED:

1. Product is not manufactured as described in the approved licensed. For example:

A. Customers place orders for special mix lots, which are composed of a (b) (4) [redacted] (b) (4) [redacted] aqueous allergenic finished licensed products. The customer orders are not linked to the specific patients. Approximately (b)(4) special mix lots can be manufactured per week.

Publicly Available



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Greer Openly Advertised Its Custom Mix Service




## Prescription Services

GREER® Pharmacy is a licensed compounding pharmacy and is USP Chapter <797> compliant. GREER Pharmacy specializes in the compounding of allergy immunotherapy prescriptions for physicians throughout the United States, Canada, and several European countries.

GREER Pharmacy utilizes US licensed extracts in the compounding of allergy immunotherapy prescriptions. An average delivery time for various formulations of allergy immunotherapy prescriptions is 1 week.

GREER Pharmacy services can help

- Reduce start-up costs for new practices
- Free valuable staff time in established practices
- Reduce inventory management and costs

To call in a new or refill prescription or to speak to a Customer Care Specialist, call 800.378.3906.

ontents


02 Ordering Information
04 Standardized Extracts
05 Pollen
09 Fungi and Smuts
11 Epithelia, Miscellaneous Inhalants, and Insects
12 Ingestant Extracts
14 Made to Order Items
14 Custom Mixtures
14 Premium Antigens
14 Sterile Diluents
17 Sterile Empty Vials and Plastic Colored Caps
18 Safety Syringes
18 Syringes and Syringe Trays
19 Ancillary Products
21 Vial Racks
21 Skin Testing Devices
22 Prescription Services


## Ordering Information

### Ordering

For the best possible service, specify account number, item number, product name, vial size and dilution, aqueous or glycerinated, and scratch or multiple-dose vial, as shown in the catalog.

Certain extracts and mixtures cannot be supplied in the 1:10 w/v strength due to excessive precipitation; these will be supplied at the strongest possible w/v strength. Glycerinated extracts can be supplied in 1:20 w/v or weaker dilutions. Extracts ordered in protein nitrogen units are available aqueous only. **Physician license must be on file.** Proper identification will be required from institutions.

### Minimum Order

A minimum order of $25.00 is required. Please combine orders to achieve minimum.

### Made to Order Items

Specific products have been identified as made to order items based on low utilization. These are non-stocked products. Delivery will be a minimum of 4 to 6 weeks. Please consult your Customer Care Specialist for more information.

### Custom Mixtures

Custom mixtures are specially priced. A minimum order of 100 mL is required to process a custom mixture. A signed custom mixture form must be received specifying exact formula desired with a maximum of 12 antigens per mixture. Delivery will be a minimum of 4 to 6 weeks. **Custom mixtures cannot be returned.** Please consult your Customer Care Specialist for more information.

## Custom Mixtures

Custom mixtures are specially priced. A minimum order of 100 mL is required to process a custom mixture. A signed custom mixture form must be received specifying exact formula desired with a maximum of 12 antigens per mixture. Delivery will take a minimum of 4 to 6 weeks. **Custom mixtures cannot be returned.** Please consult your Customer Care Specialist for more information.

Exhibit JJ



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Skibo Approved Greer's Catalog and Website

Electronic Copy

| GREER | Title: Approval of Advertising and Promotional Materials | | Effective Date: SEP 2 7 2006 |
|---|---|---|---|
| | SOP # RA006 | Rev: New | |
| ATTACHMENT I – ADVERTISING AND PROMOTION MATERIALS APPROVAL FORM | | Page 1 of 1 | Page 7 of 7 |

Initiated By: Tiffany Ahles Date: 4/16/10

Product: Human Catalog [ ] New Piece [X] Revised Piece

Material Category: Human

Material Piece Number (MPN): 041610H238

Material Presented for Review: [ ] Draft Text/Proof Date:_____ [ ] Revised Text/Proof Date:_____ [X] Final Text/Proof Date: 4/16/10

Reason for Review (new, new with previously approved text or revised): Revised Scientific Name on Item S10 Rust, Wheat Stem and/or Smut and Rust (page 10). Online pdf of catalog and online catalog on website corrected. Next printing of catalog will have corrected name

[ ] Implement immediately [ ] Destroy previous stock. Amt to be destroyed: _____

[X] Exhaust old inventory and phase in new revision upon depletion or by:

| REVIEWERS | APPROVED AS IS, SIGN & DATE | REVISE THESE, INITIAL & DATE, INSERT DETAILS ON THE DOCUMENT. | FINAL APPROVAL SIGN & DATE |
|---|---|---|---|
| Marketing | Tiffany Ahles 4/16/10 | | Tiffany Ahles 4/27/10 |
| Regulatory | JS | | [signature] 4/23/10 |
| Attorney | | | |

APPROVED Review Package Sent for filing to:

Regulatory (Date): _____

Initiator (Date): _____

Electronic Copy

| GREER | Title: Approval of Advertising and Promotional Materials | | Effective Date: SEP 2 7 2006 |
|---|---|---|---|
| | SOP # RA006 | Rev: New | |
| ATTACHMENT I – ADVERTISING AND PROMOTION MATERIALS APPROVAL FORM | | Page 1 of 1 | Page 7 of 7 |

Initiated By: Tiffany Ahles Date: 3/5/10

Product: Corporate Web Site [X] New Piece [ ] Revised Piece

Material Category: Human/Vet/Source Materials/Packaging

Material Piece Number (MPN): 030510H308

Material Presented for Review: [ ] Draft Text/Proof Date:_____ [ ] Revised Text/Proof Date:_____ [X] Final Text/Proof Date: 3/5/10

Reason for Review (new, new with previously approved text or revised): Launch of our new Corporate web site effective March 8th

[ ] Implement immediately [ ] Destroy previous stock. Amt to be destroyed: _____

[ ] Exhaust old inventory and phase in new revision upon depletion or by:

| REVIEWERS | APPROVED AS IS, SIGN & DATE | REVISE THESE, INITIAL & DATE, INSERT DETAILS ON THE DOCUMENT. | FINAL APPROVAL SIGN & DATE |
|---|---|---|---|
| Marketing | Tiffany Ahles 3/5/10 | | |
| Regulatory | JS 3/5/10 | comments sent to TA | |
| Attorney | | | |

APPROVED Review Package Sent for filing to:

Regulatory (Date): _____

Initiator (Date): _____

Exhibits JJ & EE



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# FDA Specifically Identified Custom Mixes in Its Inspections

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

DISTRICT OFFICE ADDRESS AND PHONE NUMBER
Jacqueline Little, Ph.D, Team Leader
ORA/OE Division of Compliance Management and Operations, HFC-210
U.S. Food and Drug Administration
5600 Fishers Lane,
Rockville, MD. 20857

DATE(S) OF INSPECTION
2/21/07 – 2/27/07

FEI NUMBER
1011574

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT IS ISSUED
TO: Mr. John G. Roby, President and CEO

FIRM NAME
Greer Laboratories, Inc.

CITY, STATE AND ZIP CODE
Lenoir, North Carolina 28645

THIS DOCUMENT LISTS OBSERVATIONS MADE BY THE FDA REPRESENTATI
REPRESENT A FINAL AGENCY DETERMINATION REGARDING YOUR COMPL
IMPLEMENT, CORRECTIVE ACTION IN RESPONSE TO AN OBSERVATION, YO
OR SUBMIT THIS INFORMATION TO FDA AT THE ADDRESS ABOVE. IF YOU

DURING AN INSPECTION OF YOUR FIRM I OBSERVED:

Quality System

1. Complaint 05093, Lot 18140 & 18531, Mite D. Farinae & Pteronyssinus, reported on 3/24/05, that customer is having (4-5) patients that are having adverse reaction. Completed Form GL1152, Adverse Event Questionnaire, confirmed that local, s
have not been submitted in any annual

2. The following lots were rejected due
Building #4, Rm 207, and were "o
investigations were not completed/doc
H , Attachment I, dated 2/01/06, to
deviation, corrective and preventive a
disposition, whether the deviation is re

a) GS Eastern 7 Tree Mix (30 r

b) Beech, American (30 ml), L

c) Pigweed, Rough/Redroot (3

3. The following lot history records docu
product mix, and vial labeling errors. A
drug product and other drug products
documented on a written record and di

Fibers/Product Mix/Vial Labeling

a) Lot History Record 38140, Cottonw
dated 1/24/06.

SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE

FORM FDA 483 (4/03) PREVIOUS EDITION OBSOLETE
PAGES

3. The following lot history records documented that finished product allergenic lots were rejected for fibers, product mix, and vial labeling errors. A thorough investigation, to include whether other batches of the same drug product and other drug products that may have been associated with this particular failure, was not documented on a written record and did not include any conclusions or followup.

b) Lot History Record 59717, PMG SJ 7 Tree Mix, 10 ml, Lot 59717 (Complete Lot rejected, 13 vials) dated 11/15/06.

c) Lot History Record 59719, PMG SJ7 Tree Mix, 10 ml, Lot 59719 (Complete Lot rejected, 13 vials), dated 11/15/06.

Vial Labeling errors

a) Lot History Record 53765, Schultz Tree Mix #1, 50 ml, Lot 53765 (Complete Lot rejected, 10 vials)

b) Lot History Record 53696, Schulhafer Weed Mix, 50 ml, Lot 53696 (Complete Lot rejected, 10 vials)

c) Lot History Record 59368, Walnut Pollen, Black, 10 ml, Lot 59368 (Complete Lot rejected, 10 vials)

RELATORS_0121040; *see also* Exhibit HH

## Relators Mischaracterize the Record and Claim Custom Mixes Were Not an Industry-Wide Practice

Further, Greer's own industry organization, APMA, described how APMA's other members engaged in different "categories of activity" than Greer and noted that Greer was the "*one* . . . allergenic product manufacturer" that had "assert[ed]" that "Custom Mixing" without "a prescription for a single named patient" was "permitted." Ex. 9 at 3-4, 7. Greer was the only

apma
ALLERGENIC PRODUCTS MANUFACTURERS' ASSOCIATION

July 18, 2014

Via Email: <contact@hhs.gov> and Overnight Mail

Jay E. Slater, M.D.
Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Vaccines Research and Review
Division of Bacterial, Parasitic & Allergenic Products, HFM
1401 Rockville Pike
Rockville, MD 20852-1448

Re: Allergen Extract Custom Mixes and the Compounding Quality Act

Dear Dr. Slater:

The Allergenic Products Manufacturers' Association (APMA) represents the scientific and regulatory compliance interests of manufacturers of a[...] nation and is committed to enhancing the contributions of a[...] the public welfare through cooperation with government agen[...] standards.[1] Historically, the APMA has worked with its me[...] FDA on scientific and regulatory matters and supply a venu[...] annual forum for industry and FDA to meet for an informati[...] the Laboratory of Immunobiochemistry for FDA-issued co[...] inconsistencies in the data as they occur. Our members ex[...] standards that apply to the biologics industry in addition t[...] allergen extract industry. The purpose of these quality stan[...] produce safe, effective, and quality product for the benefit [...] public welfare.

One subject that has recently been a topic of disc[...] industry is Custom Mixes. Manufacturers of allergenic prod[...] to manage activities related to the manufacture of custom mix[...] scope of their approved license agreements and in accordanc[...] after many years of consistent FDA recognition of the accep[...] existing licenses, recent FDA enforcement activity has led t[...] APMA members regarding appropriate compliance measures applicable to custom mixes. The APMA recognizes that manufacturers of custom mixes are subject to specific sterility, safety, and potency testing requirements where applicable[2] with regard to allergenic products generally.

[1] For additional information regarding the APMA, please visit: http://www.apma.us/
[2] Potency testing only applies to standardized products.

3. *Custom Mixing for "Office Use"*: Manufacturers prepare a customized mixture of allergen extracts in a classified environment pursuant to a physician's order, but not pursuant to a prescription for a single named patient—rather, such custom mixes are often intended for multiple patients as identified by the physician. Not all physicians have the ability to manufacture these mixes in their office.

*Exhibit 9 at 4*

Further complicating and confusing matters is the impact of FDA's recent statement regarding a physician's order or prescription on the regulatory provisions referenced above. Specifically, in response to one (1) allergenic product manufacturer's assertion that the FDA has long permitted the preparation of custom mixes in response to a physician's order, FDA responded by stating "[r]egardless of whether or not FDA has objected to the manufacture of [custom mixes] after receipt of a physician's prescription order for a specific patient, . . . [the] current manufacture of these mixes is not linked to specific patients or a prescription."[19] This

*Exhibit 9 at 7*

Corrected Opp. at 24

## Relators Mischaracterize the Record and Claim Custom Mixes Were Not an Industry-Wide Practice

***First***, there was no "industry-wide practice" among competing allergen manufacturers with regard to making and selling "custom mixes." Many of Greer's competitors – including two other allergen manufacturers owned by Greer's parent company, Ares Life Sciences ("Ares"), as well as "one of the top three players in the allergenic extract market in the United States" – sold "Custom ***Patient*** Prescriptions" that required receipt of a patient-specific prescription. *See infra* § II.E. These products complied with longstanding FDA law and guidance. *See infra* § II.A-D. In contrast, Greer sold custom mixes ***without*** receiving either an FDA license or a patient-specific

**6. Greer's "Industry's Understanding" Defense Fails Because Many of Its Competitors – Including those Owned by Its Parent – Only Compounded Patient-Specific Prescriptions**

Greer argues that because manufacturing non-patient specific bulk custom mixes was "an industry-wide" practice, "Greer reasonably believed it was acting properly." MSJ 21. To the contrary, one of the industry's "top three players" and two fellow subsidiaries of Greer's own parent company each overtly advertised that they only made custom mixes by named-patient prescription. *See supra* § II.E. It is therefore well-nigh impossible for Greer to argue that it

**E. While Several Other Manufacturers Were Manufacturing by Individual Patient Prescription, Greer Was Selling Unlicensed Custom Mixes Without Prescriptions**

Further, Greer's own industry organization, APMA, described how APMA's other members engaged in different "categories of activity" than Greer and noted that Greer was the "***one*** . . . allergenic product manufacturer" that had "assert[ed]" that "Custom Mixing" without "a prescription for a single named patient" was "permitted." Ex. 9 at 3-4, 7. Greer was the only company to receive a Warning Letter from FDA. *Id.* at 7.

Corrected Opp. at 1, 6, 24

# Custom Mix Labels Look Nothing Like Named-Patient Prescription Labels













Exhibit NN; GRLI-00138377; GRLI-00157817; GRLI-00138358

# Relators Mischaracterize the Record and Claim Greer Hid Custom Mixes from FDA

Finally, in 2012, Greer's Associate Director of Regulatory Affairs, Kimberly Davis, "***removed the wording around custom mixes***" from an FDA Medwatch form – a document that Greer is required to send to FDA when the Company is made aware of adverse events. Ex. 31; *see also* Ex. 32 at 132:11 (Davis "[didn't] understand why" she deleted "custom mixes" from Greer's submission to FDA).

**To:** Monica Edwards[medwards@greerlabs.com]
**From:** Kimberly Davis
**Sent:** 2012-11-30T22:42:04Z
**Importance:** Normal
**Subject:** AE 12-023
**Received:** 2012-11-30T22:42:04Z
Listing of Extract Product Mixtur

Please substitute the attached
provided to you today. Since t
we removed the wording arou

Please substitute the attached listing of extract product mixtures for AE 12-023 in the document provided to you today. Since the MedWatch needs to be forwarded to Antigen Labs and Alk-Abello we removed the wording around custom mixes.

Kimberly A. Davis
*Associate Director, Regulatory Affairs*

kdavis@greerlabs.com | www.greerlabs.com
T 828.750.7530 | F 828.754.5320

GREER
allergy immunotherapy
In Touch. Within Reach.

Corrected Opp. at 9; Exhibit 31



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Greer Told FDA It Considered Custom Mixes to Be Within the Scope of Its License

May 22, 1991

Ms. Marcy Hecht
Drug Listing Branch, HFD-334
Division of Drug Quality Evaluation
Office of Compliance
Center for Drug Evaluation and Research
5600 Fishers Lane
Rockville, MD 20857

Labeler Code: 022840
Registration No.: 1011574

Dear Ms. Hecht:

Enclosed are the Drug Listing Forms with the labeling—labels and circulars—attached to each form as requested in your note.

As mentioned in Greer's l
License for "Allergenic Ex
manufacturers like Greer m
custom basis or a prescrip
are used do not contain
printed out by the compu
information is added for th
are used, the volume, add
glycerin is added or not.
added.

However, the labels do con
Legend, the Company Name
preservatives, and storag
reviewed and approved by
Research (CBER) before it
products are different from most traditional drugs because there are no standard marketed packages with NDC numbers.

The last four listings for the different "Sterile Diluents for Allergenic Extracts," as regulated by CBER, do not have package inserts or other labeling.

If there are any questions on the forms, please call me directly.

Sincerely,

Clay Sisk
Regulatory Affairs Manager
Responsible Head

As mentioned in Greer's letter submitted May 10, 1991, **a Biologics License for "Allergenic Extracts" is unusual because under it, extract manufacturers like Greer make a host of separate extracts, many on a custom basis or a prescription basis.** Therefore, the stock labels that are used do not contain all details about the product until later printed out by the computer for an order. **At that time "custom" information is added for the many permutations,** such as which allergens are used, the volume, additional mixtures or dilutions, and whether glycerin is added or not. Lot numbers and expiration dates are also added.

Exhibit X

# Relators Mischaracterize the Record and Claim Custom Mix Sales "Surged" in 2014




Data Compiled from Exhibit 85

# Relators Mischaracterize the Record and Claim Greer Retaliated Against Them

regulatory compliance. Roby did not hesitate from pressuring Skibo in March 2012 to downplay Greer's regulatory risk to the Company's owner, Ares. Ex. 55 ("I have taken your board update and added the FDA inspections to the slides. ***I will need you to present this tomorrow. The main goal is to communicate we are not a regulatory risk.***"). Skibo refused.

**To:** Luba Skibo[LSkibo@greerlabs.com]
**From:** John Roby
**Sent:** 2012-03-06T14:15:27Z
**Importance:** Normal
**Subject:** Ares meeting
**Received:** 2012-03-06T14:15:28Z
Regulatory Affairs Update Final Feb 1 2012.pptx

Luba,

I have
tomorr
are not

I have taken your board update and added the FDA inspections to the slides. I will need you to present this tomorrow. Call me if you need to discuss or want to add to the pitch. The main goal is to communicate we are not a regulatory risk. Your thoughts? John

Corrected Opp. at 16; Exhibit 55

# FDA Guidance Relators Cite Is Irrelevant

If Section 610.17 were not clear enough, however, FDA confirmed in 1997 that this provision was "particularly important" and applies to "antigens," Ex. 5 at 1, which FDA has defined as synonymous with "allergen[s]," Ex. 4 at 51. *See United States ex rel. Donegan v.*

GUIDANCE FOR INDUSTRY

FOR THE EVALUATION OF COMBINATION VACC
FOR PREVENTABLE DISEASES:

PRODUCTION, TESTING AND CLINICAL STUDI

U.S. Department of Health and Human S
Food and Drug Administration
Center for Biologics Evaluation and Research
April 1997

**B. Defining "Combination Vaccine"**

For this document, a combination vaccine consists of two or more live organisms, inactivated organisms or purified antigens combined either by the manufacturer or mixed immediately before administration and intended to:

(1) prevent multiple diseases, or
(2) prevent one disease caused by different strains or serotypes of the same organism.

Vectored vaccines and conjugated vaccines are combination vaccines if the prevention of the disease caused by the vector organism or the carrier moiety is to be one of the combination's indications.

**C. Applicable Regulations**

The regulations in Title 21 of the Code of Federal Regulations (21 CFR) Parts 600-680 pertain to biological products in general. Particularly important is 21 CFR 610.17, Permissible combinations, which states that licensed products may not be combined with other licensed or unlicensed products either therapeutic, prophylactic, or diagnostic, except as a license is obtained for the combined product. 21 CFR 601.2(a) describes the information that is required in a Product License Application (PLA). When filing the PLA, submit completed forms FDA

2. "Antigen" means a natural or synthetic substance capable of eliciting an antibody or cell-mediated immune response or both; the term "antigen" is sometimes used synonymously with "allergen". However, while all allergens are antigens, not all antigens behave as allergens, particularly in some individual animals or man.

Corrected Opp. at 18; Exhibits 4 & 5



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Relators Mischaracterize the Record and Claim Greer Used "RX" to Mislead FDA

First, Greer frequently "put the Rx symbol next to its custom mix products," even though "those products were not related to an actual physician's prescription." Ex. 7 at 141:19-142:5. Greer's systematic reference to custom mixes as "Rx" was ingrained in the Company's standard operating procedures ("SOP"), which instructed employees adding or altering custom mixes on Greer's database that ***"the name of the [custom] mix . . . must be preceded by "RX."*** Ex. 19 at 900.

Effective Date: SOP# PO081 Page 1 of 8
Rev. : A Data Entry for Custom Mixes (AS400)

Customer Service — Date 7/13/01 — Extract — Date 7-16-01
Director of Operations — Date
Director RA/QA — Date

**AUTHORS:** Carol Strickland and Mickey S

**OBJECTIVE:** To establish guidelines for en the AS400, RX Mix Item Inq

**REFERENCES:**

**SOP PL013** Expiration Dating – Extr
**SOP PL017** Generation and Use of Co
**SOP PO023** Creation of Custom Mix

**FORM GL1008** Custom Mixture Req
**FORM GL1031** DP Correction of Computer Entry

**DEFINITIONS:**

**CMAL (CUSTOM MIX APPROVAL LETTER)** – This document is printed (AS400) each time a new custom mix is entered or changed and is sent to the customer to obtain the doctor's signature (SCMAL).

**CMSS (CUSTOM MIX SPECIFICATION SHEET)** – A document created by the Custom Mix Coordinator (CMC) outlining all details on a specific custom mix.

**CONTENT INSERT** – This document is printed (AS400) after the SCMAL is obtained and is included in each shipment of the custom mix.

**NOTE:** Printers specified in this SOP refer to the printer of choice for the task. However, an alternate printer may be used if needed.

I. **MATERIALS AND EQUIPMENT:**

A. Completed form GL1008
B. AS400 options dealing with Custom Mixes
C. Custom Mix Backorder Printout and/or Revial Point Printout

**C. Custom (RX) Mix Description Field (Description)**

1. The "description" line is entered by the CMC or the OES or delegate and is a required field.
2. The name of the mix is usually assigned by the customer and must be preceded by "RX". The first part of an "in-house" custom mix description must be preceded by "RXPRS".

Corrected Opp. at 7; Exhibit 19



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# SOP Actually Indicates "RX" Should Not Be Used Externally

E. **Custom (RX) Mix Vial Label Field**

The three lines titled "LABEL1", "LABEL2", and "LABEL3" must be entered. Entries on these three lines are the information that is printed on the CMAL, the labels, and the Content Insert.

1. Do not enter "RX".
2. The 3 lines have 22 spaces each that can be used.
   a. Use only lines 1 and 2 for Veterinary Custom Mixes.
   b. Use line 3 if necessary but only for Human accounts and only if the mix does not consist totally of standardized items.
   c. If only one line needed, use only line 2.

OBSOLETE

3. Spell out as much as possible. For example: RX CAAC Weed Mix #2 in the description line would be Colorado All. and Asthma Clinic Weed Mix #2 in the label lines.

Effective Date: SOP# PO081 Page 1 of 8
Rev. : A Data Entry for Custom Mixes (AS400)

| | | | | |
|---|---|---|---|---|
| ...vice | 7/13/01 Date | Extract | 7-16-01 Date |
| ...perations | 7/17/01 Date | Quality Assurance | 7-17-01 Date |
| QA | 02/17/01 Date | | |

Carol Strickland and Mickey Seagle

...: To establish guidelines for entering new and changing existing Custom Mixes in the AS400, RX Mix Item Inquiry.

...ES:

PL013 Expiration Dating – Extracts
PL017 Generation and Use of Content Inserts
PO023 Creation of Custom Mix Specification Sheets
FORM GL1008 Custom Mixture Request Sheet
FORM GL1031 DP Correction of Computer Entry

OBSOLETE

**DEFINITIONS:**

**CMAL (CUSTOM MIX APPROVAL LETTER)** – This document is printed (AS400) each time a new custom mix is entered or changed and is sent to the customer to obtain the doctor's signature (SCMAL).

**CMSS (CUSTOM MIX SPECIFICATION SHEET)** – A document created by the ...stom mix.

...SCMAL is obtained

...or the task.

I. **MATERIALS AND EQUIPMENT:**

A. Completed form GL1008
B. AS400 options dealing with Custom Mixes
C. Custom Mix Backorder Printout and/or Revial Point Printout

Exhibit 19

Case 5:13-cv-00110-KDB-DSC Document 188-1 Filed 11/07/19 Page 23 of 26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Relators Mischaracterize the Record and Claim Greer Misled FDA

| | |
|---|---|
| **1981** | In this letter regarding "Antigen E" regulations, Greer states that its "mixes in stock" included "vials of patient prescription material"; "vials . . . of doctor's special mixes" that "are mixes prepared on a doctor's orders for his use in diagnosis and/or therapy of his patients"; and "special mixes . . . not yet vialed" – ***nowhere does Greer state that any of these mixes were not prepared upon receipt of a patient-specific prescription.*** Ex. 71 at 1. To the contrary, Greer's clearly begins by describing the "mixes in stock" as consisting of "patient prescription material . . . prepared on a doctor's orders for his . . . patients." |

GREER LABORATORIES, Inc.

P. O. Box 800 • Phone 704 754-5327 • LENOIR, N. C., 28645 U.S.A.

December 8, 1981

Harry M. Meyer, Jr. MD
Director, BoB/FDA
8800 Rockville Pike
Bethesda, MD 20205

Dear Dr. Meyer:

With regard to the recently e
of Short Ragweed containing c
We have in stock a number of
Ragweed pollen extract. Most
a small amount or such a high
Antigen E assay is not possib
extract used to prepare these
having been used in productio

A survey of our records shows
amount of the above mentioned

A. Approximately 1193 s
dose vials of patien
doctor's orders for

B. Approximately 82 via
doctor's special mix
orders for his use

C. Approximately 19 sto
yet vialed.

Due to the amount of materia
mixtures, we respectfully re
(except G5 Ragweed mix which
(mixed) prior to January 27.
taining Short Ragweed extract prepared (extracted or mixed) after January 27, 1982 will be labeled and dated as per the new regulations and as per the procedures we have submitted.

Thank you for your consideration of this request and please let me know if additional information is required.

Sincerely,

William White, Jr.
Responsible Head

WW/adm

> A survey of our records shows that we have, by rough count, the following amount of the above mentioned mixes in stock.
>
> A. Approximately 1193 sets (a set is 1X10 ml or 2X5 ml) of maintenance dose vials of patient prescription material. (Vials made up per doctor's orders for individual patients.)
>
> B. Approximately 82 vials (of various sizes - mostly 30 and 50 ml) of doctor's special mixes. These are mixes prepared on a doctor's orders for his use in diagnosis and/or therapy of his patients.
>
> C. Approximately 19 storage bottles of special mixes as in B (above) not yet vialed.

Relators' Appendix A; Exhibit 71



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Relators Mischaracterize the Record and Claim Greer Misled FDA

violations" (1988), and "major deviations for GMPs" (1989). Ex. 34 at 1 (1994 EIR). More importantly, during FDA's inspections, Greer's senior management specifically told FDA that Greer ***"mix[ed] . . . individual patient prescriptions of biological extracts"*** and that the exact room in which Greer mixes extracts "is primarily used to fill ***individual prescription extract***." *Id.* at 6.

GREER LABORATORIES, INC.
P. O. BOX 800
639 NUWAY CIRCLE
LENOIR, NC. 28645

EIR
08/30/94 - 09/19/94
RED

SUMMARY OF FINDINGS

This inspection of this biological extract and
was conducted as part of the ATL-DO 1994 third q
to cover the drug production operations. This f
sterile injectable diluents and began making
thiomalate injection under contract to [redacted]

This firm has history of non compliance in the d
operations. This company was permanently
manufacturing pharmaceuticals at their old fac
They then opened the current plant in 1982. Th
numerous and serious violations in nearly al
reviewed. A regulatory letter was recommended but was not sent
pending a re-inspection. The reinspection took place in 1988, and found continuing serious violations. No regulatory action was taken due to delays in the review process between the CDER and CBER. A third drug inspection was conducted in 1989, and again found major deviations for GMPs. Because the products covered during that time were sterile diluents for extract dilutions, regulatory action would not be supported by either center. No further drug inspection have been performed at this company since 1989.

Current EI finds that the fi
[redacted]
sodium [redacted] injection, wh
product is aseptically filled in
room. This inspection found th
was deficient. The firm did no
nor consider major aspects of m
of those aspects include valid
during mixing, preservative effe
mixing tanks. The drug master r
of the final formulation, nor are some of the manufacturing steps determined by scientific evaluation. The stability studies performed were ill-conceived and conducted haphazardly. The expiration date was established without using the marketed formulation. Pilot batches were used which did not meet finish product release specifications. No formal evaluations were conducted or documented after each stability protocol was completed, and it was unclear that the firm was aware of the some of the shortcomings of each study.

Mr. Bannerman stated that Ms. Oaks and Ms. Hamerick have the same primary functions with only one difference. He said Ms. Hamerick is responsible for the mixing, filtration, filling, stoppering and crimping operations for individual patients prescriptions of biological extracts. He stated that Ms. Oaks has the same responsibilities as Ms. Debra Crisp except that her responsibilities are for biological extracts productions. Mr. Bannerman stated Ms. Hamerick supervises two employees and that Ms. Oaks supervises seventeen employees.

I asked if production continued in room 145W between the date of the first sample until the acceptable results were achieved on 2/21/94. Ms. Tinsley explained that normal production was occurring daily in room 145W which is primarily used to fill individual prescription allergenic extracts vials.

Corrected Opp. at 10; Exhibit 34



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Greer Was Open with FDA About Custom Mixes During the 2013 Inspection

GREER

**Date:** 14November2013
**Prepared by:** David F. Bunney, VP of Quality, RA, and Manufacturing Operations
**Re:** FDA CBER Summary

**DAY I**

**Summary (05November2013):**

Two investigators from the U.S. Food and Drug Administration (FDA) Center for Biologics Evaluation and Research (CBER) Team Biologics arrived at the Lenoir facility the morning of Tuesday, November 05, 2013. Upon arrival Cynthia Jim, Investigator, and Burnell M. Henry, Investigator, presented their credentials with badge numbers 5427 (expiration 09/06/2015) and 5012 (expiration 05/18/2015), respectively.

The investigators were escorted to Building #4 Conference Room. They stated that they were with CBER Team Biologics … inspection was a routine cG… jurisdiction to enter the fa… Cosmetics Act, and Form … portions of that regulation ar…

*Section 704 of the Fed…*

*Sec. 704(a)(1) For purpose… designated by the Secretary… owner, operator, or agent i… factory, warehouse, or esta… cosmetics are manufactured… commerce or after such intr… food, drugs, devices, tobacc… at reasonable times and wi… warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials, containers, and labeling therein.*

*In the case of any person (excluding farms and restaurants) who manufactures, processes, packs, transports, distributes, holds, or imports foods, the inspection shall extend to all records and other information described in section 350c of this title, when the standard for records inspection under paragraph (1) or (2) of section 350c(a) of this title applies, subject to the limitations established in section 350c(d) of this title. In the case of any factory, warehouse, establishment, or consulting laboratory in which prescription drugs, nonprescription drugs intended for human use, restricted devices, or tobacco products are manufactured, processed, packed, or held, the inspection shall extend to all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs, nonprescription drugs intended for human use, restricted devices, or tobacco products which are adulterated or misbranded within the meaning of this chapter, or which may not be manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of this chapter, have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter.*

P.O. Box 800
639 Nuway Circle NE
Lenoir, NC 28645
USA

www.greerlabs.com
T 800.438.0088
F 828.754.5320

Investigator Cynthia Jim inquired about the meaning of "Custom Mix". She was informed that it is a mixture of licensed products prepared to a doctor's order. Investigator Cynthia Jim inquired about the difference between Custom mixes and the prescription department. Investigator Cynthia Jim was informed that Rxs are for named patients and custom mixes were for general use by the requesting practitioner. Investigator Cynthia Jim requested to see all of Greer's approval letters and the SOP for custom mixes.

Exhibit 40

Case 5:13-cv-00110-KDB-DSC Document 188-1 Filed 11/07/19 Page 26 of 26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER